**Affirmed as Modified; Opinion Filed October 28, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-13-00939-CR

**DAO MINH TRUONG, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 199th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 199-80748-2013**

## MEMORANDUM OPINION

Before Justices Bridges, Lang, and Evans
Opinion by Justice Lang

Following a plea of not guilty, appellant Dao Minh Truong was convicted by a jury of murder. Punishment was assessed by the jury at fifty-eight years' imprisonment and a $10,000 fine.

In four issues on appeal, appellant contends (1) the evidence is "legally insufficient" to support the conviction of appellant "under the law of parties as submitted to the jury" or "as the primary actor" and (2) the trial court erred by "overruling appellant's objection to the appellant's statements made to the police while under arrest," and "failing to sua sponte give the jury a general voluntariness instruction pursuant to the 'law applicable to the case doctrine' pursuant to article 38.22 sec. 6 C.C.P. during guilt/innocence." Additionally, appellee, the State of Texas, asserts in a "cross-point" that "[t]he trial court's written judgment improperly omits a deadly weapon finding."

We decide appellant's four issues against him. Additionally, we decide in favor of the State on its "cross-point." We (1) modify the trial court's judgment to include a deadly weapon finding and (2) affirm the trial court's judgment as modified. Because all dispositive issues are settled in law, we issue this memorandum opinion. *See* TEX. R. APP. P. 47.2(a), 47.4.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The indictment in this case alleged in part that on approximately September 9, 2011, appellant intentionally and knowingly caused the death of an individual by stabbing him with a "deadly weapon." The "deadly weapon" allegedly used by appellant was described in the indictment as "a sharp object," "a stick," "a knife," or "an object unknown to the grand jurors."[1]

Prior to jury selection on the first day of trial, appellant filed a written motion requesting in part that the trial court hold a hearing outside the presence of the jury to determine the voluntariness of any written or oral admissions or confessions by appellant. The trial court granted that motion. Additionally, the trial court stated prior to jury selection that it "will note for the record that defense counsel has indicated that he has been able to communicate with his client for the past two years without the aid of an interpreter, and that the defendant has stated on the record that he does not need an interpreter to understand the proceedings."

At trial, Soka Voth, appellant's ex-wife, testified she was married to appellant at the time of the events giving rise to this case. Voth stated she and appellant bought a house on Sierra Blanca Drive in Wylie, Texas, in 2008 and lived there with their two children. According to Voth, she and appellant had ongoing marital problems starting in 2008. By September 2011, they had agreed to divorce. Approximately one week before the events in question, appellant moved out of the house. Voth continued living there.

---

[1] Additionally, the indictment alleged appellant caused the death of an individual by shooting him with a firearm. That allegation was abandoned by the State during trial.

Voth testified that in July 2011, she began "chatting" online daily with Hong Yin, a man she met on an Internet website. According to Voth, appellant "knew about it." On the Tuesday before September 9, 2011, Yin arrived in the Dallas area by bus to look for an apartment and a job. Voth picked him up at the bus station. Voth testified she hoped to become "more than friends" with Yin. She stated she and Yin planned that he would stay at the house with her until he found an apartment. She testified Yin cooked and cleaned at the house while she was at work.

On September 9, 2011, Voth worked from 3 p.m. to 11 p.m. at her job as a pharmacy technician at a location about thirty minutes away from her home. Yin was at the house when she left to go to work. Voth testified that at approximately 6 p.m. that evening, appellant sent her a text message that read, "Don't let me see your boyfriend again, you cheating B."

After work, Voth went directly to a park about five minutes away from the house. Yin was at the park waiting for her. Voth stated they planned to go out to eat. She testified that before they decided where to go to eat, she saw another text message on her cell phone from appellant. According to Voth, appellant "told me to come home; otherwise he will break everything in the house." Voth testified she and Yin drove to the house. She stated she saw no person or car in front of the house. She and Yin drove around the block three times. She dropped Yin off near the intersection of Sierra Blanca Drive and the nearest perpendicular street, Silvercreek Drive, which is two houses away from her house. Then, she parked in front of her house near a streetlight. After she got out of her car, Voth saw appellant standing near the side of the house. She testified he was holding a stick that was approximately twelve to fifteen inches long. According to Voth, as she walked toward the front door of the house, appellant asked her "where's your boyfriend." She told appellant "he's not here."

Voth stated she entered the house and saw a few broken items on the floor. About two minutes later, she walked back outside. Voth testified she saw that appellant had walked to the

–3–

intersection of Sierra Blanca and Silvercreek and approached Yin. Voth called 911. Voth testified that about three minutes later, appellant ran back towards the side of the house, then ran to the back of the house. According to Voth, appellant's brother, Hai, was in a car in back of the house. Voth stated appellant and Hai drove down the alley, turned onto Silvercreek Drive, and stopped near the spot where Yin was standing. Voth testified both appellant and Hai got out of the car. She stated appellant and Yin began "pushing" each other and Hai tried to "break it up." Voth was still on the phone with the 911 operator.

According to Voth, the "pushing" went on for "a good few minutes." At some point, she lost sight of the men "for a while." She stated she heard noises and talking, but could not hear what they were saying. Eventually, appellant and Hai got back in their car and drove away. Voth testified that before appellant and Hai returned to their car, she heard a loud noise. She stated she "wasn't sure if it was a gun or a stick, like, hitting the cement, like, real hard."

After appellant and Hai left the scene, Voth ran toward Yin. She testified Yin fell to his knees and she saw blood on his shirt. According to Voth, police arrived a minute or two later.

An audio recording of Voth's 911 call on the evening in question was admitted into evidence and played for the jury. Additionally, Voth testified that as part of her preparation for trial, she listened to an audio recording of a phone conversation between two individuals that occurred on September 15, 2011, at 10:39 a.m. Voth testified she recognized the voices on that recording as appellant and his sister, Mindy. She stated that their conversation was in both English and Vietnamese. The recording was marked as State's Exhibit 16 and was admitted into evidence and played for the jury.

Officer Brenda Martin of the Wylie Police Department testified that at approximately 11:36 p.m. on September 9, 2011, she was dispatched to a disturbance on Sierra Blanca near Silvercreek. Martin stated that when she arrived at the scene, she saw Voth outside of the house.

–4–

According to Martin, Voth told her she "believed her friend had been shot."  Voth led Martin to the corner of Silvercreek and Sierra Blanca.  Martin testified she approached Yin and saw he was bleeding.  Martin administered first aid until paramedics arrived several minutes later.  Martin stated Yin was "somewhat conscious" when she arrived and told her he "had been shot at close range."

Officer Steve Trester and Sergeant Tommy Walters of the Wylie Police Department testified they arrived on the scene shortly after Martin.  They secured the crime scene and searched for possible weapons or shell casings.  Trester and Walters each testified no weapons or shell casings were found.[2]

Mark Johnson testified he is a detective with the Wylie Police Department.  He stated he was on call on the night of the events in question and was dispatched to the scene described above.  Other police officers were already present at the scene when he arrived.  Shortly after his arrival, Johnson received notification that a suspect had been apprehended at a location in Garland.  Johnson immediately proceeded to that location.  When Johnson arrived, the suspect, whom Johnson identified in the courtroom at trial as appellant, was sitting in the back of a patrol car in handcuffs.  Johnson testified the patrol car contained equipment capable of making audio and video recordings.

At that point in the proceedings, counsel for the State asked to approach the bench and a discussion occurred off the record.  Then, the trial court held a hearing outside the presence of the jury to determine the voluntariness of appellant's statements in two audio visual recordings offered by the State: (1) an interview of appellant by Johnson that took place on the evening in question while appellant was in the patrol car and Johnson was standing outside the patrol car

---

[2] Additionally, several other law enforcement officers testified respecting investigation of the crime scene and the collection of evidence. Their testimony is duplicative of other testimony and therefore is not detailed in this opinion.

and (2) a subsequent interview of appellant by Johnson at the police station later that same night. The recording of the patrol car interview was marked as State's Exhibit 21 and the recording of the interview at the police station was marked as State's Exhibit 23.[3]

During the hearing on voluntariness, Johnson testified that prior to the patrol car interview, he read appellant the required warnings respecting his rights. Johnson stated appellant agreed to talk to him and did not ask for an attorney. The trial court took a recess and reviewed both exhibits.

Defense counsel argued in part during the hearing,

> My—my contention is, it was an involuntary statement; that he didn't voluntarily waive his right to an attorney. It was a coerced statement. It was in a coercive atmosphere, he was under arrest, it was a custodial interrogation, and he did not—they—this detective did not comply with the—with Article 38.22; more specifically, Subsection 3.
> . . . .
> . . . Only if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.
> I don't think any of that's been met in this particular case. I don't think the defendant admits to any understanding of what was going on when it—when this detective intimidated him into giving—into talking to him.
> He didn't even pay any attention to the defendant when he gave him his Miranda warnings.
> In the interrogation in—at the police station, he—the defendant mentions very—at the very inception, an attorney; mentions something about, I want an attorney.
> It was just hard to understand, but he brings up an attorney.
> Detective didn't even pay any attention to this; went right on questioning him.
> So, consequently, I just feel like the totality of the circumstances, the language issue, which is reflected in these—in these statements—I mean, in these interviews—reflects that, under the totality of the circumstances, Dao Truong had no comprehension of what this detective was trying to do in eliciting those statements from him. And I don't think the waiver was voluntarily given.

---

[3] In the record on appeal, the electronic copy of the recording of the patrol car interview is labeled as State's Exhibit 23 and the electronic copy of the recording of the interview at the police station is labeled as State's Exhibit 21. In this opinion, we refer to the two exhibits by the numbers assigned to them at trial.

The trial court filed written findings of fact and conclusions of law in which it stated in part,

> Prior to the commencement of any custodial interrogation in the field, Detective Johnson read the Miranda warnings aloud to Dao Minh Truong. These warnings substantially comply with the requirements of Article 38.22 Code of Criminal Procedure.
>
> Prior to the commencement of any custodial interrogation at the jail, Detective Johnson provided a written copy of the Miranda warnings to Dao Minh Truong and Truong initialed the document indicating he understood the warnings. These warnings substantially comply with the requirements of Article 38.22 Code of Criminal Procedure.
>
> Following these warnings, the defendant knowingly, intelligently and voluntarily waived all of such rights and freely made the statements which are reflected in the videotape. The defendant's demeanor, attitude and participation in the discussion with Detective Johnson clearly establish that the defendant was not coerced or induced to give such statements by threat or persuasion. At times, the defendant himself directs the flow of the discussion to address the subjects he wishes to discuss. He is coherent and understandable, and expresses thoughts and details in logical sequences. His responses were appropriate to the questions asked of him.
>
> The Court concludes that the defendant's videotaped statements were free and voluntary acts after a knowing, intelligent and voluntary waiver of his rights.

After the hearing on voluntariness, the jury returned to the courtroom and the presentation of evidence continued. The State offered Exhibits 21 and 23 into evidence. Johnson testified those exhibits constituted fair and accurate depictions of his conversations with appellant. Defense counsel stated, "Your Honor, I've made my objections, and I ask the Court to take notice of the objections I've made in full." The trial court stated, "Yes. So noted for the record." State's Exhibits 21 and 23 were admitted into evidence and played for the jury.

In State's Exhibit 21, appellant and Johnson were not within range of the video camera, but their voices were recorded. Johnson stated aloud multiple warnings pertaining to appellant's rights. Johnson paused several times to ask appellant if he understood. Appellant responded affirmatively each time. After stating the warnings, Johnson asked, "Do you understand the rights I've read to you?" Appellant answered, "Yes." Then, Johnson stated, "Do you want to

talk to me or not?" Appellant responded with a sentence that was unintelligible due to other noise on the recording. Johnson responded, "The questions are going to be about what happened tonight." Appellant stated, "Okay." At that point, Johnson began asking questions about the events of that evening and appellant responded to each question. Appellant stated in part that the person who was with him during the events in question was not his brother.

In State's Exhibit 23, both Johnson and appellant appeared on camera. They were seated in an interview room with a desk in between them. Johnson provided appellant with a form document that listed the same warnings pertaining to appellant's rights that Johnson had read aloud in the previous interview described above. Johnson read each of those warnings aloud to appellant. Johnson paused after reading each one, passed the form document to appellant, and asked appellant to write his initials next to the corresponding provision on the document if he understood it. After reading aloud to appellant his right to have a lawyer present to advise him prior to and during any questioning, Johnson stated, "Do you understand that one? Initial it." Appellant stated, "Do I need a lawyer now?" Johnson responded, "That's—let me finish reading it and then—." Appellant stated, "Oh, okay." Then, Johnson continued reading several more warnings aloud. Appellant appeared to initial each one. After Johnson finished reading the warnings, he pointed to the bottom portion of the document and stated to appellant "you can go ahead and read that." Appellant appeared to read the document for several seconds, then asked, "What do you mean by 'I do not want to talk to a lawyer?'" Johnson stated, "That means you're agreeing to talk to me now without a lawyer present. You know, there's no lawyer in here, but you and I are gonna talk." Appellant appeared to read the document for several more seconds, then pointed to the bottom of the document and asked, "Do I sign here?" Johnson stated, "Well, don't worry about signing it unless you want to write out a statement. But let's talk first, okay?" Then, Johnson proceeded to question appellant and appellant responded to Johnson's questions.

During the questioning, appellant stated in part (1) on the date in question, he told Yin to get out of his house and stay off his property; (2) he later returned to his house and saw Yin nearby; (3) Yin began pushing him and the two of them had a "confrontation"; (4) after fighting with Yin, he "took off" because he was scared of Yin; (5) he does not have a gun and did not shoot anyone; (6) he did not kill Yin and does not know how Yin died; and (7) the man who was with him at the time he fought with Yin was not his brother, but rather was a friend named "Calvin" whom he met while playing basketball at a park.

Sergeant Jeff Brownrigg of the Collin County Sheriff's Office testified he photographed appellant on September 13, 2011, and September 15, 2011, at the request of the Wylie Police Department. The photographs taken by him were admitted into evidence. Brownrigg testified the photographs showed possible bruising on appellant's abdomen and left arm, scratches on his back left shoulder, and cuts on both of his hands.

Detective Jonathan Johnson of the Wylie Police Department testified that as part of the investigation of this case, he attempted to locate a possible murder weapon. He testified no weapon consistent with Yin's injuries was located.

Uyen Henson testified she is a forensic scientist with the Texas Department of Public Safety Crime Laboratory in Garland. She testified she prepared reports respecting the analysis of evidence in this case, including "DNA analysis" of "apparent blood" on an item labeled as appellant's shirt. Henson testified the "apparent blood" found on that shirt was not Yin's blood, but rather was consistent with appellant's DNA profile.

Dr. Mathis Adams testified he is a trauma surgeon. He treated Yin at Medical Center of Plano just after midnight on the night in question. According to Adams, when Yin arrived at the medical center, he was in shock and unable to respond to any questions. Adams testified he made notes respecting three external injuries on the front of Yin's body. One injury was in the

–9–

upper right rib area, another was in the abdominal area, and the third was in the lower left rib area. Additionally, there were two wounds to Yin's back. Adams stated Yin had "major internal injuries." Adams testified he performed surgery on Yin, but was not able to stop his bleeding. Adams did not find any bullets, metal, or other foreign objects inside Yin's body.

William Rohr testified he is a medical examiner for Collin County. He prepared the autopsy report on Yin. According to Rohr, the cause of death was "multiple stab wounds." Rohr testified he observed several stab wounds on Yin's body. He stated that the most serious wound resulted in a "tear in the inferior vena cava," which is the blood vessel that "brings blood from the legs and abdomen to the heart." Rohr testified the stab wounds were "sharp force injury" caused by a "sharp object." He stated he did not believe a gunshot was involved in any of the injuries.

Tan Than testified she is a court interpreter and is licensed to interpret Vietnamese. She testified that at the request of the State, she accurately translated and transcribed a "jail phone call" recorded by the Collin County Sheriff's Office on September 15, 2011, at 10:39 a.m. A copy of that transcript, marked as State's Exhibit 47, was offered into evidence as "the translation of [State's Exhibit] 16 that's already in evidence." State's Exhibit 47 was admitted into evidence and published for the jury. In the transcript, a statement made by the person identified by Voth in State's Exhibit 16 as appellant was translated as follows: "Yeah, the other guy at that time. It was too dark that's why I couldn't see him, but I saw that he hit, that he was using a wood stick to hit him that's why I stabbed him."

Appellant testified on direct examination that he did not need an interpreter. He stated he moved to the United States from Vietnam when he was eight years old and has lived in the United States for twenty years. He graduated from Bryan Adams High School in Dallas. He stated that at the time of the events in question, he worked for a semiconductor company.

–10–

Appellant testified that on September 9, 2011, he went to the house on Sierra Blanca sometime between 4:30 and 7 p.m. to retrieve some belongings. He parked in back of the house near the garage and entered the house. He testified that a man he had never seen before was in the house. According to appellant, that man was Yin. Appellant stated he felt "scared" and did not want "any fight or confrontation between me and him." Appellant stated he said "hi" to Yin, then proceeded to collect his belongings. Appellant testified that while he was packing his belongings, his brother, Hai, arrived to help him with packing and moving.

According to appellant, at some point while he was at the house, he saw Yin "throwing some kind of dart" at the fence. Appellant testified that made him think Yin was a "really dangerous guy." Appellant stated he took the dart from Yin and put it in his car. Appellant testified he told Yin "this is my house" and "you have to leave the house." According to appellant, Yin left the house. Appellant stated that about five or ten minutes later, he and Hai finished their work and left.

Appellant testified that at approximately 10:30 p.m. on that same date, he and Hai returned to the house so appellant could collect more belongings and "work out" some things with Voth. They drove to the house in Hai's car. Appellant stated that because he "sense[d] danger" based on his earlier encounter with Yin, he went to the garage and picked up a wooden "stick" about two or three feet long. He testified the stick had no sharp points. He stated he checked every room in the house, then waited for about an hour. He stated that during that time, he sent Voth several text messages. She did not reply to those messages.

Appellant stated that at some point, Voth parked in front of the house and walked toward the front door. He testified that as she approached the front porch, he asked her who the man was who had been in the house earlier. He and Voth spoke briefly. Then, Voth went into the house.

–11–

Appellant testified he turned and saw Yin walking nearby. Appellant stated he approached Yin and asked him who he was. Yin answered. Appellant testified he "really [didn't] care" what Yin said. Appellant stated he walked to the back of the house, where his brother Hai had parked the car. Appellant stated he thought to himself, "I don't want to deal anymore this stuff [sic]," and he and Hai decided to leave. They drove down the alley and turned onto Silvercreek. According to appellant, Yin motioned to them to stop and they did so.

Appellant stated he got out of the car. He carried the stick with him. Appellant testified he approached Yin and asked him what he needed. Appellant stated he heard Voth "scream out" from near the house and he turned to look at her. He testified that at that point, Yin grabbed the stick. Appellant stated he tried to grab the stick back and he and Yin struggled over the stick. Appellant stated he "maybe" hit Yin with the stick while trying to get it back. According to appellant, Yin knocked him to the ground. Appellant testified Hai helped him get up. Appellant stated that after he got back up, he again struggled with Yin for the stick. Appellant stated Hai came to help him. According to appellant, Yin "let the stick go" and appellant grabbed it. Appellant testified he saw Yin "walk around the corner." Then, appellant stated, he and Hai got back in the car and drove away. Appellant testified he did not stab Yin and did not see Hai stab Yin. Further, appellant testified he did not see or shoot a gun on the evening in question.

Appellant testified that as he and Hai left the scene, he saw police approaching. Appellant stated he planned to take Hai to "safety" at their mother's house in Garland and return to his house to explain the incident to police.

On cross-examination, appellant acknowledged that he told police he was with "a guy named Calvin" at the time of the events in question and his brother Hai "wasn't involved." Appellant testified he "made that up." Additionally, appellant testified in part on cross-examination as follows:

–12–

Q. Did you tell your sister, in your phone conversation, that you stabbed Hong Yin?

A. Um, as I, um—we—we are bilingual, so there are—the word that could mean more than once to us. And I could—um, my—that word can mean two—two meaning to—to me, but it could be four or five meaning to you; so if—if people have different, you know, understanding of that word. [sic]

Q. Did you tell your sister that you stabbed Hong Yin?

A. I don't remember.

Q. Do you remember telling your sister that you stabbed Hong Yin to protect your brother?

A. I don't remember, sir.
. . . .
Q. Is it possible that you stabbed Hong Yin five times?

A. No, sir.

Q. Is it possible that your brother stabbed Hong Yin five times?

A. No, sir. I mean, I don't know.

On redirect examination, appellant testified as to the pronunciation of the Vietnamese words for "stabbed" and "hit." Further, after stating his pronunciation of those two words, appellant testified as follows:

Q. Okay. Do you recall whether or not you told your sister that you stabbed him, or you hit him?

A. I don't remember.
. . . .
Q. But the—but the Vietnamese words for stabbed and hit—almost identical, aren't they?

A. Yes.

Q. So to one Vietnamese person, the word (unintelligible) or (unintelligible), or whatever it is, could mean stabbed; to another Vietnamese person it could mean hit. Correct?

A. Yes, sir.

Q. Or maybe even half-dozen other words.

A. Yes. They a lot of word. [sic]

Upon conclusion of the presentation of evidence, the charge of the court was read to the jury by the trial court. The charge allowed for conviction of appellant as a primary actor or a party to the charged offense. Additionally, the charge (1) defined "deadly weapon" as "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury" and (2) contained alternative application paragraphs respecting four items described as "deadly weapons": a sharp object, a stick, a knife, and "an object unknown to the grand jurors."

After deliberating, the jury found appellant "guilty of Murder as charged in the indictment" and assessed punishment as described above. The trial court signed a judgment in accordance with that verdict. The judgment contains a heading that states "Findings on Deadly Weapon:," which is followed by "N/A." (emphasis original). Appellant filed a motion for new trial, which was overruled by operation of law. This appeal timely followed.

## II. SUFFICIENCY OF THE EVIDENCE

We address appellant's first and second issues together. In those issues, appellant contends the evidence is "legally insufficient" to support the conviction of appellant (1) "under the law of parties as submitted to the jury" or (2) "as the primary actor."

### A. Standard of Review

When an appellant challenges the sufficiency of the evidence to support a conviction, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See, e.g.*, *Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014); *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). Evidence is sufficient if "the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict." *Wise*, 364 S.W.3d at 903. If the evidence

–14–

is conflicting, we "'presume that the factfinder resolved the conflicts in favor of the prosecution' and defer to that determination." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 326 (1979)). This standard is the same for both direct and circumstantial evidence. *Id.* Further, "circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

When the trial court's charge authorizes the jury to convict on more than one theory, the verdict of guilty will be upheld if the evidence is sufficient on any one of the theories. *Anderson v. State*, 416 S.W.3d 884, 889 (Tex. Crim. App. 2013) (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)).

### *B. Applicable Law*

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011). A person acts intentionally or with intent, with respect to the result of his conduct when it is his conscious objective or desire to cause the result. *Id.* § 6.03(a). A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b).

A person is criminally responsible as a party to an offense "if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." *See id.* § 7.01(a). A person is criminally responsible for the conduct of another if, acting "with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02.

The Texas Penal Code defines a "deadly weapon" as "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 1.07(a)(17)(B) (West Supp. 2013).

## C. Application of Law to Facts

Appellant argues (1) "there was no weapon found and it was never determined what was used to stab the victim," (2) "there was no blood found on [appellant's] clothing which would indicate a close proximity to the stabbing," and (3) the translation of the phone call made by him to his sister from jail "was inaccurate" because "the Vietnamese words for stab and hit were almost identical and could also mean even a half a dozen other words." Further, appellant asserts,

> [N]o instruction on the law of parties was appropriate and Appellant could not be convicted as a party to the instant offense because there is no evidence that Appellant acted with the intent that the victim be killed by soliciting, encouraging, directing, aiding or attempt to aid his brother stab the victim. Everyone was unaware [of] the type of injury suffered by the victim until medical treatment was rendered to the victim. There is no evidence of any words of encouragement by Appellant. The victim was getting the better of Appellant in the confrontation. Appellant was smaller than the victim. The brother of Appellant apparently interceded in the conflict when Appellant was knocked to the ground. There is no evidence that Appellant called for his brother to come to his aid. It appears that the brother acted on his own volition. Therefore, Appellant could not have formed the necessary means [sic] rea necessary to commit the offense of murder.

The State responds that the evidence was sufficient to support appellant's conviction for murder as a principle or a party. The State asserts in part,

> Appellant threatened the victim, Hong Yin. Appellant then took his brother to lay in wait for Yin at home, armed himself, and was seen fighting with Yin moments before Yin was found with five stab wounds. He fled the scene and lied to the police, showing his consciousness of guilt. And he admitted to his sister that he stabbed Yin.

According to the State, "[a]ppellant's complaints merely re-argue the jury's determinations of witness credibility."

The record contains evidence that (1) at approximately 6 p.m. on the evening in question, appellant sent Voth a text message that read, "Don't let me see your boyfriend again, you cheating B"; (2) later that evening, appellant approached Yin while holding a stick; (3) appellant fought with Yin; (4) appellant's brother came to appellant's aid during the fight; (5) appellant

–16–

and his brother fled the scene; (6) immediately thereafter, Yin collapsed with multiple stab wounds; (7) Yin died as a result of the stab wounds; and (8) in a phone call to his sister from jail a few days later, appellant stated in Vietnamese that he "stabbed" the "other guy" while fighting with him. There is no evidence in the record as to what clothing appellant was wearing at the time he fought with Yin. Further, although appellant disputes the accuracy of the word "stabbed" in the translation of his phone call to his sister that was admitted into evidence, Than testified her translation was accurate. Our standard of review requires that when evidence is conflicting, we "'presume that the factfinder resolved the conflicts in favor of the prosecution' and defer to that determination." *See Wise*, 364 S.W.3d at 903. Additionally, while no weapon was found in this case, (1) the record shows Yin died as a result of stab wounds and (2) the indictment and charge of the court each contained four descriptions respecting the "deadly weapon" allegedly used to stab Yin, including a stick and "an object unknown to the grand jurors." *Cf. Tucker v. State*, 274 S.W.3d 688, 691–92 (Tex. Crim. App. 2008) (even without description of weapon, injuries suffered by victim can by themselves be sufficient basis for inferring deadly weapon was used). On this record, we conclude the evidence is sufficient to support appellant's conviction as either a principle or a party. *See Wise*, 364 S.W.3d at 903.

We decide against appellant on his first and second issues.

### III. APPELLANT'S RECORDED STATEMENTS

Next, we address appellant's third and fourth issues, which pertain to his recorded statements made to police after his arrest.

#### A. Standard of Review and Applicable Law

We review a trial court's decision respecting the admissibility of evidence under an abuse of discretion standard. *See, e.g., Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007); *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007). The trial court's ruling will

–17–

be upheld if it is within the zone of reasonable disagreement and correct under any theory of law applicable to the case. *Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008); *Winegarner*, 235 S.W.3d at 790.

In *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Specifically, when an individual is taken into custody and subjected to questioning, "[h]e must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id*. at 479. After such warnings have been given and a statement is obtained, that statement will be admissible at trial only if the defendant waived his rights voluntarily, knowingly, and intelligently. *Id*.; *see Joseph v. State*, 309 S.W.3d 20, 24 (Tex. Crim. App. 2010).

"On direct appeal, we measure the propriety of the trial court's ruling with respect to alleged *Miranda* violations under the totality of the circumstances, almost wholly deferring to the trial court on questions of historical fact and credibility, but reviewing de novo all questions of law and mixed questions of law and fact that do not turn on credibility determinations." *Leza v. State*, 351 S.W.3d 344, 349 (Tex. Crim. App. 2011). Further, it is the State's burden to establish a valid waiver of *Miranda* rights by a preponderance of the evidence. *Id*. There are two facets to any inquiry with respect to the adequacy of a purported waiver of *Miranda* rights. *Id*. First, the waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id*. Second the waiver must be made "with a full awareness both of the nature of the right being abandoned and the consequences of the

decision to abandon it." *Id.* However, before it may be said that a waiver of a *Miranda* right is involuntary, there must be some element of official intimidation, coercion, or deception. *Id.*

Article 38.22 of the Texas Code of Criminal Procedure codifies the holding of *Miranda* and sets out rules governing the admissibility of an accused's written and oral statements. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 (West 2013); *Jones v. State*, 944 S.W.2d 642, 650 n.11 (Tex. Crim. App. 1996). Section 3(a) of article 38.22 provides in part that no oral statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless (1) an electronic recording is made of the statement and (2) prior to the statement, but during the recording, the accused is given the warning in section 2(a) of article 38.22 and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning.[4] *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, §§ 2(a), 3(a); *see also Smith v. State*, 779 S.W.2d 417, 427 (Tex. Crim. App. 1989) ("voluntariness" under both constitutional and state law doctrines is to be measured according to totality of the circumstances).

Unlike an involuntariness claim respecting *Miranda* rights, a claim that a purported waiver of the statutory rights enumerated in article 38.22 is involuntary "need not be predicated on police overreaching." *Leza*, 351 S.W.3d at 352 (citing *Oursbourn v. State*, 259 S.W.3d 159, 172 (Tex. Crim. App. 2008)). "Circumstances unattributable to the police that nevertheless adversely impact an accused's ability to resist reasonable police entreaties to waive his statutory rights . . . are 'factors' in the voluntariness inquiry, though they 'are usually not enough, by themselves, to render a statement inadmissible under Article 38.22 [.]'" *Id.* (quoting *Oursbourn*, 259 S.W.3d at 173).

---

[4] Section 2(a) of article 38.22 requires that the accused receive a warning that (1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial; (2) any statement he makes may be used as evidence against him in court; (3) he has the right to have a lawyer present to advise him prior to and during any questioning; (4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and (5) he has the right to terminate the interview at any time. TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(a).

Section 6 of article 38.22 provides in part,

> In all cases where a question is raised as to the voluntariness of a statement of an accused, the court must make an independent finding in the absence of the jury as to whether the statement was made under voluntary conditions. . . . Upon the finding by the judge as a matter of law and fact that the statement was voluntarily made, evidence pertaining to such matter may be submitted to the jury and it shall be instructed that unless the jury believes beyond a reasonable doubt that the statement was voluntarily made, the jury shall not consider such statement for any purpose nor any evidence obtained as a result thereof.

TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6. The Texas Court of Criminal Appeals has stated as follows respecting section 6:

> This is the sequence of events that seems to be contemplated by Section 6: (1) a party notifies the trial judge that there is an issue about the voluntariness of the confession (or the trial judge raises the issue on his own); (2) the trial judge holds a hearing outside the presence of the jury; (3) the trial judge decides whether the confession was voluntary; (4) if the trial judge decides that the confession was voluntary, it will be admitted, and a party may offer evidence before the jury suggesting that the confession was not in fact voluntary; (5) if such evidence is offered before the jury, the trial judge shall give the jury a voluntariness instruction.

*Oursbourn*, 259 S.W.3d at 175.

Where a rule or statute requires a jury instruction under the particular circumstances, that instruction is "the law applicable to the case." *Id*. at 180.

### B. Application of Law to Facts

#### 1. Admissibility of Appellant's Recorded Statements

In his third issue, appellant contends the trial court erred by overruling his objection to his recorded statements made to police after he was arrested. According to appellant, (1) during the patrol car interview, he "stated no he did not want to talk to the officer" and (2) "there was questioning and improper inducement that presents [sic] the oral statements of Defendant from being voluntary." Appellant complains of violation of his *Miranda* rights and article 38.22. In support of his contentions, appellant cites the portion of defense counsel's argument described above from the voluntariness hearing.

–20–

The State responds that the trial court properly concluded appellant knowingly, intelligently, and voluntarily waived his rights in question.

Appellant provides no citation to the record to support his assertion on appeal that "there was . . . improper inducement," nor does he describe any specific inducement. *See* TEX. R. APP. P. 38.1(i) (appellant's brief must contain clear and concise argument for contentions made, with appropriate citations to record). Further, appellant does not explain, and the record does not show, at what point during the patrol car interview he "stated no he did not want to talk to the officer." *See id.* To the extent appellant's complaint on appeal can be construed to otherwise challenge the voluntariness of his statements, the record shows the trial court made written findings that, after receiving proper warnings, appellant "knowingly, intelligently and voluntarily waived all of such rights and freely made the statements." Specifically, the trial court found,

> The defendant's demeanor, attitude and participation in the discussion with Detective Johnson clearly establish that the defendant was not coerced or induced to give such statements by threat or persuasion. At times, the defendant himself directs the flow of the discussion to address the subjects he wishes to discuss. He is coherent and understandable, and expresses thoughts and details in logical sequences. His responses were appropriate to the questions asked of him.

These findings are not specifically addressed by appellant on appeal.[5] Further, these findings are supported by the recordings described above that were admitted into evidence at trial. On this record, we conclude the trial court did not err by concluding appellant knowingly, intelligently, and voluntarily waived his *Miranda* and article 38.22 rights. *See Leza*, 351 S.W.3d at 351–52.

We decide against appellant on his third issue.

### 2. Article 38.22 Voluntariness Instruction

---

[5] In the portion of defense counsel's trial court argument cited by appellant on appeal, defense counsel states in part that "at the very inception" of the interview at the police station, appellant "mentions something about, I want an attorney. It was just hard to understand, but he brings up an attorney." Appellant cites no evidence in the record, and we have found none, showing appellant stated "I want an attorney." *Cf. Dinkins v. State*, 894 S.W.2d 330, 351 (Tex. Crim. App. 1995) ("An invocation must be clear and unambiguous; the mere mention of the word 'attorney' or 'lawyer' without more, does not automatically invoke the right to counsel."); *Williams v. State*, 402 S.W.3d 425, 434 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (accused's query, "Do I need a lawyer present for this," was not unequivocal request for counsel).

In his fourth issue, appellant contends the trial court erred by "failing to sua sponte give the jury a general voluntariness instruction pursuant to the 'law applicable to the case doctrine' pursuant to article 38.22 sec. 6 C.C.P. during guilt/innocence." Appellant asserts he was entitled to such instruction because "the issue of voluntariness was raised during trial."

The State responds that "such an instruction is only required if the issue of voluntariness is litigated in front of the jury." According to the State, "[a]ll of Appellant's arguments and questioning regarding this issue were conducted out of the jury's presence." Thus, the State argues, there was "no voluntariness issue before the jury" and the jury charge was proper.

As described above, the court of criminal appeals has explained that after a trial judge holds a hearing outside the presence of the jury pursuant to section 6 of article 38.22 and decides the accused's statement is admissible, "a party may offer evidence before the jury suggesting that the confession was not in fact voluntary" and "if such evidence is offered before the jury, the trial judge shall give the jury a voluntariness instruction." *Oursbourn*, 259 S.W.3d at 175 (emphasis added). Appellant does not describe, and the record does not show, any evidence "offered before the jury" respecting the voluntariness of appellant's statements. *See id.* Therefore, we conclude the trial court did not err by not including a voluntariness instruction in the charge of the court. *See id.*

Appellant's fourth issue is decided against him.

## IV. DEADLY WEAPON FINDING

In a sole "cross-point" on appeal, the State asserts the trial court's written judgment improperly omits a deadly weapon finding. According to the State, "[b]ecause Appellant was charged and convicted of murder with the use of a deadly weapon, the judgment must include an affirmative finding of a deadly weapon."

–22–

When the jury makes an affirmative deadly weapon finding, the trial court has a mandatory duty to enter a deadly weapon finding in the written judgment. *See* TEX. CODE CRIM. PROC. ANN. art. 42.12, § 3g(a)(2) (West Supp. 2013); *Ex parte Poe*, 751 S.W.2d 873, 876 (Tex. Crim. App. 1988). A failure by the trial court to comply with this mandatory duty is a clerical error that can be corrected by a nunc pro tunc order of the trial court. *See, e.g., Poe*, 751 S.W.2d at 876; *Asberry v. State*, 813 S.W.2d 526, 530 (Tex. App.—Dallas 1991, pet. ref'd). "[I]f the indictment by allegation specifically places the issue before the trier of fact (i.e. ". . . by stabbing him with a knife, a deadly weapon. . . ."), then an affirmative finding is de facto made when the defendant is found guilty 'as charged in the indictment.'" *Polk v. State*, 693 S.W.2d 391, 394 (Tex. Crim. App. 1985); *accord Crumpton v. State*, 301 S.W.3d 663, 664 (Tex. Crim. App. 2009); *Poe*, 751 S.W.2d at 875.

As described above, the indictment in the case before us alleged appellant intentionally and knowingly caused the death of an individual by stabbing him with a "deadly weapon." Additionally, the record shows the jury found appellant "guilty of Murder as charged in the indictment." On this record, we conclude the jury made an affirmative finding of a deadly weapon. *See Crumpton*, 301 S.W.3d at 664; *Poe*, 751 S.W.2d at 875; *Polk*, 693 S.W.2d at 394; *cf. Ramirez v. State*, No. 05-04-00251-CR, 2005 WL 1983546, at *2 (Tex. App.—Dallas Aug. 18, 2005, pet. ref'd) (not designated for publication) (concluding jury necessarily made deadly weapon finding by finding defendant guilty of murder as party or principal) (citing *Sarmiento v. State*, 93 S.W.3d 566, 570 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd)). Further, we conclude the trial court erred by not entering the deadly weapon finding in the written judgment. *See* TEX. CODE CRIM. PROC. ANN. art. 42.12, § 3g(a)(2); *Poe*, 751 S.W.2d at 876.

"Appellate courts have the power to reform whatever the trial court could have corrected by a judgment nunc pro tunc where the evidence necessary to correct the judgment appears in the

record." *Asberry*, 813 S.W.2d at 529 (modifying trial court's judgment to include jury's affirmative finding of use of a deadly weapon); *see also Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993); TEX. R. APP. P. 43.2(b). Because the necessary information appears in the record before us, we modify the judgment of conviction to include a deadly weapon finding. *See Asberry*, 813 S.W.2d at 529–30. Specifically, we (1) delete the portion of the trial court's judgment that states "N/A" under the heading "Findings on Deadly Weapon:" and (2) add the words "YES, NOT A FIREARM" under that heading. *See id*.; *cf. Montoya v. State*, No. 07-11-0492-CR, 2012 WL 2847902, at *4 (Tex. App.—Amarillo July 11, 2012, no pet.) (mem. op., not designated for publication) (modifying judgment to read "YES, NOT A FIREARM," rather than "N/A," where record showed affirmative finding of deadly weapon which was not a firearm); TEX. CODE CRIM. PROC. ANN. art. 42.12, § 3g(a)(2)–3g(b) (containing provisions applicable only when weapon in affirmative finding is firearm).

We decide the State's "cross-point" in its favor.

### V. CONCLUSION

We decide (1) against appellant on his four issues and (2) in favor of the State on its "cross-point." Further, we (1) delete the portion of the trial court's judgment that states "N/A" under the heading "Findings on Deadly Weapon:" and (2) add the words "YES, NOT A FIREARM" under that heading. As so modified, the trial court's judgment is affirmed.

/Douglas S. Lang/
DOUGLAS S. LANG
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
130939F.U05

–24–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

DAO MINH TRUONG, Appellant

No. 05-13-00939-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 199th Judicial District Court, Collin County, Texas
Trial Court Cause No. 199-80748-2013.
Opinion delivered by Justice Lang. Justices Bridges and Evans participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

We (1) delete the portion of the trial court's judgment that states "N/A" under the heading "<u>Findings on Deadly Weapon:</u>" and (2) add the words "YES, NOT A FIREARM" under that heading.

As **MODIFIED**, the judgment is **AFFIRMED**.


Judgment entered this 28th day of October, 2014.